UNIVERSITY MEDICAL CENTER, INC. d/b/a University of Louisville Hospital, Appellant/Cross–Appellee,

v.

Michael G. BEGLIN, individually; and Michael G. Beglin as executor of the estate of Jennifer W. Beglin; Michael G. Beglin as parent and next friend of the minor William Patrick Beglin; Michael G. Beglin as parent and next friend of the minor Kelly Ann Beglin; William Patrick Beglin, individually; and Kelly Ann Beglin, individually, Appellees/Cross–Appellants.

Nos. 2009–SC–000289–DG, 2009–SC–000839–DG.

Supreme Court of Kentucky.

Oct. 27, 2011.

As Modified on Denial of Rehearing March 22, 2012.

Edward H. Stopher, Raymond G. Smith, Matthew Bowman Gay, Boehl, Stopher & Graves, LLP, Robert Michael Connolly, Carol Dan Browning, Bethany Breetz, Stites & Harbison, PLLC, Louisville, KY, Josh M. Kantrow, Lori S. Nugent, Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, Chicago, IL, Counsel for Appellant/Cross-Appellee.

Francis Thomas Conway, Conway & Conway, Chadwick Neal Gardner, Louisville, KY, Counsel for Appellees/Cross-Appellants.

Wesley Reed Butler, Barnett, Benvenuti & Butler, PLLC, Lexington, KY, Counsel for Amicus Curiae Kentucky Hospital Association.

Virginia Hamilton Snell, Wyatt, Tarrant & Combs, LLP, Louisville, KY, Counsel for Amicus Curiae Kentucky Chamber of Commerce.

Opinion of the Court by Justice VENTERS.

We granted discretionary review in this matter to examine when it is proper for the trial court to give a missing evidence instruction, and whether it was permissible here to hold an employer liable for punitive damages based upon the gross negligence of an employee. University Medical Center, Inc. d/b/a University of Louisville Hospital ("University Hospital"), appeals from an opinion of the Court of Appeals which affirmed a judgment entered by the Jefferson Circuit Court in favor of Appellee, Michael G. Beglin.[1] Based upon a jury verdict, the trial court entered judgment awarding the following compensatory damages: $1,922,102.00 for the destruction of Jennifer Beglin's power to labor and earn money; $367,358.09 for her medical expenses; $7,543.00 for her funeral and burial expenses; and $3,000,000.00 for her children's loss of parental consortium. The jury also awarded $3,750,000.00 in punitive damages, resulting in a total award of $9,047,003.09.

The damages were based upon a finding of the jury that the hospital, through its employees and agents, acted negligently in

---

1. Beglin appeared as a party individually on his own behalf and as Executor of the Estate of his wife, Jennifer W. Beglin, and as Parent and Next Friend of Minors William Patrick Beglin and Kelly Ann Beglin, the children of Jennifer W. Beglin.

causing the death of Jennifer Beglin.[2] Co-defendants, Dr. Susan Galandiuk (the surgeon) and Dr. Guy M. Lerner (the anesthesiologist), were found not liable by the jury.

University Hospital[3] presents the following three issues: (1) the trial court erred by giving a missing evidence instruction; (2) the trial court erred by giving a punitive damages instruction; and (3) the giving of the missing evidence and punitive damages instructions violated its due process rights. For the reasons stated below, we determine that the trial court properly gave a missing evidence instruction, and we affirm the judgment awarding compensatory damages. However, we hold that the trial court erred in giving a punitive damages instruction under the circumstances of this case. We therefore reverse the punitive damages award and remand for entry of a new judgment. By these determinations, University Hospital's due process arguments relating to punitive damages are moot, and it is not otherwise entitled to relief under these claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Considering the evidence in the light most favorable to the verdict, the essential facts are as follows. During surgery at University Hospital, Beglin's wife, Jennifer, suffered unexpected and substantial blood loss. Because of an unreasonable delay in obtaining blood from the hospital blood bank, she sustained an anoxic brain injury caused by the lack of oxygen-carrying blood, leaving her in a permanent vegetative state. She passed away on October 9, 2003, after life support was withdrawn by her family.

Evidence indicated that when the surgeons recognized that a blood transfusion was vital, they ordered a blood sample to be drawn and taken to the hospital blood bank to ascertain Jennifer's blood type, and requested that the blood needed for the transfusion be ordered. Nurse Cantrall,[4] an employee of University Hospital on duty to assist the Beglin surgery, was charged with the responsibility of ordering the blood. Ordinarily that process would take forty-five to fifty minutes. In a dire emergency, universal donor blood could be obtained from the blood bank in ten minutes. The evidence established that, unbeknownst to the surgeons, twenty-five minutes elapsed before Cantrall transmitted the order for blood to the blood bank. As Jennifer's blood loss continued, her need for a blood transfusion became desperate and immediate. Surgeons and staff in the operating room, including Cantrall, began frantic efforts to obtain the blood.[5] By the time the blood arrived, sixty-seven to seventy minutes had lapsed from when the surgeons first ordered it.

From the verdict, it appears that the jury believed that University Hospital, through its employees, Cantrall and the blood bank, acted with gross negligence in the failure to timely deliver the necessary blood, and thereby caused Jennifer's death.

One of the standardized forms used by University Hospital is captioned "occur-

2. The punitive damages were based upon a finding of gross negligence.

3. The Kentucky Hospital Association and the Kentucky Chamber of Commerce have filed Amicus Briefs in support of University Hospital's position in the case.

4. Cantrall's name is also spelled as "Cantrell" in the record. It appears that Cantrall is the correct spelling.

5. Cantrall made eighteen calls from the operating room to the blood bank to urge haste in supplying the blood.

rence report." It is to be used by employees in the ordinary course of business when significant events occur to document their experience and observations for subsequent review by the hospital's risk management staff in assessing legal liability issues. Pursuant to the hospital's policies, the reports are highly confidential and are not placed in patient files. The reports are initially filed with, and are routed through, the Risk Management Department. Therefore, given the importance and high level of confidentiality of the documents, it is a reasonable inference to conclude that the reports are, in the normal course of business, carefully preserved.

At her pre-trial deposition, Cantrall testified to her belief that she had *not* prepared an occurrence report, but if she had prepared one she would have included a chronology and her perception of the significant events that occurred during surgery. However, at trial Cantrall testified that following Jennifer's surgery she *did* complete an occurrence report form at the direction of Charge Nurse Elaine Strong, and placed it as required in the front desk bin for distribution. She further testified that the only information she believed she had recorded on the report is that CPR had been performed in the operating room, and that she included nothing about the time taken to obtain the blood from the blood bank. Strong denied asking Cantrall to prepare a report and denied ever seeing Cantrall's occurrence report. No one else testified to having any knowledge of the report's existence or content.

## II. THE MISSING EVIDENCE INSTRUCTION WAS PROPERLY GIVEN

University Hospital first argues that the trial court erred by giving the missing evidence instruction in connection with the unexplained disappearance of the occurrence report that Cantrall testified she prepared immediately following the operation pursuant to normal hospital procedures. Although University Hospital had exclusive care, custody, and control of the report (if it existed), it is unable to offer any explanation to account for its disappearance. University Hospital contends that it was fundamentally improper and contrary to Kentucky law for the trial court to give the missing evidence instruction when there was no evidence to show that it had intentionally and in bad faith lost or destroyed the document. It further argues that the instruction improperly influenced both the general verdict of liability and the punitive damages award by insinuating that the hospital covered-up adverse evidence. For the reasons stated below, we conclude that the instruction was properly given.

### The Missing Evidence Instruction

Following the form approved in *Sanborn v. Commonwealth,* 754 S.W.2d 534, 539–540 (Ky.1988), *overruled on other grounds by Hudson v. Commonwealth,* 202 S.W.3d 17 (Ky.2006), the trial court gave, over the hospital's objection, this missing evidence instruction:

> If you find from the evidence that an incident report was in fact prepared by Nurse Barbara Cantrell recording material information about Mrs. Beglin's surgery, and if you further find from the evidence that University Medical Center, Inc. d/b/a University of Louisville Hospital, intentionally and in bad faith lost or destroyed the incident report, you may, but are not required to, infer that the information recorded in the incident report would be, if available, adverse to University Medical Center and favorable to the plaintiffs.

This remains the approved instruction in both criminal and civil cases. *See Monsanto Co. v. Reed*, 950 S.W.2d 811, 815 (Ky.1997) ("Where the issue of destroyed or missing evidence has arisen, we have chosen to remedy the matter through evidentiary rules and 'missing evidence' instructions.") All agree that the *Sanborn* instruction accurately sets forth the elements necessary to permit a jury to draw an adverse inference from missing evidence.[6]

■ The text of the instruction further demonstrates two important factors relevant to our review. First, the instruction contemplates that the jury will engage in fact-finding ("*If you find from the evidence* ..."), thereby implying that, like any other issue, if there is a factual dispute in relation to the issue, the jury will resolve the disagreement. This obviously implies that, under our law, the trial court does not make any final and conclusive factual determination upon the elements of a missing evidence instruction. Second, the adverse inference portion of the instruction is optional ("*you may, but are not required, to infer* ..."). The approved instruction does not impose upon the jury a duty to draw the adverse inference even when it believes the evidence was intentionally disposed of.

As a final note, the instruction did not require the jury to affirmatively indicate in the jury verdict forms its findings or determinations in relation to the instruction. We therefore do not know if the jury found for or against University Hospital under the instruction and, consequently, whether it had any impact at all on the verdicts. It is possible that the jury concluded that the report was lost innocently, and did not hold the disappearance of the report against University Hospital.

### Evidentiary Standards for Obtaining the Instruction

University Hospital contends that the jury should not have been given the missing evidence instruction because Beglin did not show that the loss of the evidence was due to a cause other than mere negligence, and that all that was proven with respect to the occurrence report was that its disappearance was unexplained. There is no evidence to say whether the loss was intentional or accidental. Therefore, the principal issue we address is the evidentiary prerequisite for giving the instruction when potentially relevant evidence is inexplicably unavailable.

■ Citing to *Brewer v. Dowling*, 862 S.W.2d 156 (Tex.App.1993)[7] and *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3rd Cir.1995),[8] University Hospital ar-

---

6. The ongoing viability of these elements is illustrated in, for example, *Tinsley v. Jackson*, 771 S.W.2d 331 (Ky.1989); *Estep v. Commonwealth*, 64 S.W.3d 805 (Ky.2002); *Coulthard v. Commonwealth*, 230 S.W.3d 572 (Ky.2007); *Greene v. Commonwealth*, 244 S.W.3d 128 (Ky.App.2008); *Farmer v. Commonwealth*, 309 S.W.3d 266 (Ky.App.2009); and *Fields v. Commonwealth*, 274 S.W.3d 375, 416 (Ky. 2008) *overruled on other grounds by Childers v. Commonwealth*, 332 S.W.3d 64 (Ky.2010).

7. "Texas law recognizes the right to have a jury make certain inferences in a situation where a hospital *destroys* evidence, but it does not recognize this right where evidence is

merely *lost*. Appellants were entitled to show Appellees destroyed the [evidence], but they did not do so. We will not infer spoliation or destruction of the [evidence]—intentional or otherwise—from the mere fact that it is missing. Thus appellants are not entitled to a spoliation instruction based on the second rule." *Dowling* at 160 (citations omitted) (emphasis original).

8. "[I]t must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to pro-

gues that "[a] lost or missing document is insufficient as a matter of law to warrant a spoliation instruction."

University Hospital and Amici, Kentucky Hospital Association and the Kentucky Chamber of Commerce, argue that the instruction is "particularly invidious" and extraordinarily prejudicial to the party against whom it is given. They suggest that a low evidentiary threshold for obtaining the instruction would encourage attorneys to invent missing documents in order to portray the opposing party as being engaged in a cover-up. They assert, therefore, that the party seeking the instruction must be required to present affirmative evidence that the missing evidence was material and that its loss was the result of bad faith and not due to simple negligence or accidental destruction.

■ Upon examination of the authorities cited by University Hospital and Amici, we agree that the instruction must be supported by evidence, but we disagree that sound jurisprudence imposes an unusually onerous burden to obtain the instruction. We reject their position that direct and conclusive evidence of intentional and bad faith destruction as pre-determined by the trial court are absolute prerequisites for obtaining the instruction. As further explained below, we believe the better rule is that the requisite elements giving rise to the missing evidence inference may be proven, like virtually any other factual issue, by circumstantial evidence and reasonable inferences, much as would be required for any other type of instruction.

■ In this conclusion, we are particularly persuaded by the opinion of then Judge, now Justice, Stephen Breyer in *Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217 (1st Cir.1982), wherein he noted the non-controversial principle, "[w]hen the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him." *Id.* at 217. He further noted Wigmore's assertion that nonproduction alone "is sufficient by itself to support an adverse inference even if no other evidence for the inference exists:"

> The failure or refusal to produce a relevant document, or the destruction of it, is evidence *from which alone* its contents may be inferred to be unfavorable to the possessor, provided the opponent, when the identity of the document is disputed, first introduces *some* evidence tending to show that the document actually destroyed or withheld is the one as to whose contents it is desired to draw an inference.

*Id.* (quoting 2 *Wigmore on Evidence* § 291 (Chadbourn rev. 1979) (emphasis added)). "The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them." *Id. See also* 89 C.J.S. *Trial* § 666("In order to justify the court in giving an instruction, predicated on a supposed state of facts, it is not necessary that the court should be satisfied that the hypothetical case is fully sustained by the testimony.")

duce it is otherwise properly accounted for. *See generally* 31A C.J.S. *Evidence* § 156(2); 29 Am.Jur.2d *Evidence* § 177 ('Such a presumption or inference arises, however, only when the spoliation or destruction [of evi-

dence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.')." *Brewer,* 72 F.3d at 334.

Thus, in contrast to the authorities cited by University Hospital, Judge Breyer's analysis does not at all suggest the enhanced burden advocated by the hospital. His reasoning for a lesser standard becomes clearer when the reasons behind the adverse inference instruction are considered:

> The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. The fact of destruction satisfies the minimum requirement of relevance: it has some tendency, however small, to make the existence of a fact at issue more probable than it would otherwise be. *See* Fed.R.Evid. 401. Precisely how the document might have aided the party's adversary, and what evidentiary shortfalls its destruction may be taken to redeem, will depend on the particular facts of each case, but the general evidentiary rationale for the inference is clear.

> The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. The inference also serves as a penalty, placing the risk of an erroneous judgment on the party that wrongfully created the risk. In McCormick's words, "the real underpinning of the rule of admissibility [may be] a desire to impose swift punishment, with a certain poetic justice, rather than concern over niceties of proof." *McCormick on Evidence* § 273, at 661 (1972).

*Id.* at 217–218; *Akiona v. U.S.*, 938 F.2d 158 (9th Cir.1991).

 In light of these important rationales—evidentiary and deterrent—when the evidence is missing "utterly without explanation," and where, as in the instant case, the party who has lost it had absolute care, custody, and control over the evidence, we believe that the better practice is to treat missing evidence like any other evidentiary issue, and refrain from placing an enhanced burden upon the opposing party to obtain the instruction. We therefore adopt no special rule for measuring the quantum or quality of evidence that will authorize a missing evidence instruction. A trial court may use normal inferences and suppositions,[9] and may rely upon circumstantial evidence[10] in deciding whether to admit missing evidence testimony or give a corresponding instruction. In other words, the standard is as typical as with any other issue.

 Trial courts are vested with discretion in deciding what admonitions and instructions to the jury are appropriate under the evidence and attendant circumstances. Our standard of appellate review of a trial court's determinations in these type of cases will be pursuant to the abuse of discretion standard, which is the usual standard of review for a trial court's deci-

---

9. "An inference is a conclusion reasonably drawn from facts established by evidence. A supposition, or conjecture, is a presumption based upon the theory that the thing or occurrence in question could have existed or happened." *Hurt's Adm'r v. Louisville & N.R. Co.*, 298 Ky. 617, 183 S.W.2d 628 (1944).

10. "[C]ircumstantial evidence may form the basis for a conviction so long as the evidence is sufficient to convince a reasonable jury of guilt." *Davis v. Commonwealth*, 147 S.W.3d 709, 729 (Ky.2004).

sion on whether to admit or exclude evidence, *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky.2000), or to give an instruction, *Harris v. Commonwealth,* 313 S.W.3d 40, 50 (Ky.2010).

▉▉▉▉ It is necessary to clarify, however, that there are certain circumstances in which well established authority provides that a missing evidence instruction *should not* be given. Among these is when the proof shows that the evidence was lost as a result of "mere negligence." *Mann v. Taser Intern., Inc.,* 588 F.3d 1291, 1310 (11th Cir.2009). This fits comfortably within our missing evidence standard, because mere negligence negates bad faith, an element of the instruction. Similarly, other common types of cases where the instruction will not be warranted include loss of evidence as a result of fire, weather, natural disaster, other calamities, or destruction in the normal course of file maintenance, particularly in accordance with industry or regulatory standards. Lawson, *The Kentucky Evidence Law Handbook,* § 2.65[3] (4th ed. 2003) (An inference based on destruction (or loss) may not be drawn if the destroyer acted inadvertently (mere negligence) or if there is an adequate explanation for the destruction (or loss)); *Millenkamp v. Davisco Foods Intern., Inc.,* 562 F.3d 971 (9th Cir.2009) (No missing evidence inference is proper when evidence was destroyed long before litigation was anticipated).

In rejecting the heightened standard urged by the hospital, we favor, as *Nation–Wide Check Corp., Inc.* presented, a standard that deters the loss of evidence and encourages parties in litigation or expecting litigation to protect and preserve evidence, even when doing so may not be to their advantage in litigation. From our perspective, the preservation of potential evidence is always a desirable policy objective. Moreover, we do not discern the

giving of a missing evidence instruction as quite the apocalyptic event that University Hospital and Amici describe. Because our approved instruction simply informs the jury of an inference that it may accept or reject, the party who lost the evidence will be able to make his argument to the jury that the loss of the evidence was innocent or that the evidence itself was not unfavorable, and thereby negate the instruction.

### The Missing Evidence Instruction was Properly Given in this Case

▉▉▉▉ University Hospital contends that under any standard, the evidence here was insufficient to support the missing evidence instruction in this case. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co.,* 11 S.W.3d at 581. The evidence on the issue is as follows: Cantrall, after initially claiming that no occurrence report existed, later testified that she had prepared one immediately following the surgery and that she placed it in the receptacle designated by the hospital for such reports. The evidence showed that such reports were to be made by employees, when noteworthy events occur, to record a chronology of their perception of the event. The occurrence report prepared by Cantrall went missing, and University Hospital was unable to provide a reasonable explanation for its disappearance. No evidence exists that anyone other than a hospital employee or agent would have had access to the report. The proof established that the report was prepared for review by the hospital's risk management staff with an eye toward potential litigation, and therefore in the ordinary course of business would have been processed with great care to preserve a document of such importance. Shortly after the surgery, Jennifer's surgeon, Dr. Galandiuk, reported the matter to University Hospi-

tal's risk management staff with advice that the Beglin family should not be billed for the surgery. The hospital's employees were in a position to protect the document, to know what was in the document, and to account for its loss.

■■■ Based upon common-sense experience, the convergence of the factors described above reasonably supports an inference that the document was lost or destroyed by a person with an interest in preventing the disclosure of its contents. The rule is well settled that "[e]ach party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it." *Farrington Motors, Inc. v. Fidelity & Cas. Co. of N.Y.*, 303 S.W.2d 319, 321 (Ky.1957). Under the circumstances of this case, we are constrained to conclude that the trial court did not abuse its discretion in giving the missing evidence instruction. Though the giving of the instruction may have rested largely upon inferences and circumstantial evidence, for the reasons we have explained, that is perfectly acceptable.

■■■ In summary, as applied to the specific circumstance of this case, it is our holding that when it may be reasonably believed that material evidence within the exclusive possession and control of a party, or its agents or employees, was lost without explanation or is otherwise unaccountably missing, the trier of fact may find that the evidence was intentionally and in bad faith destroyed or concealed by the party possessing it and that the evidence, if available, would be adverse to that party or favorable to his opponent. When the trier of fact is a jury, the jury shall be so instructed.

### *The Missing Evidence Instruction did not Unduly Affect the General Verdict or Punitive Damages Award*

As a final note on this issue, University Hospital expresses concern that special care must attend the application of the missing evidence instruction, lest it unduly influence both the general verdict of liability and the punitive damages instruction by "nudging" and "tilting" the jury to its prejudice. We do not believe the mere giving of the instruction carries with it any unfair suggestion. However, to the extent that a properly given instruction nudges or tilts the jury, we note that its purpose is to remind the jury of the inference it may draw from the fact that material evidence in the hospital's control was missing, and thereby off-set any advantage which may have been gained by the destruction of the evidence. *See Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex.2003) ("Because the instruction itself is given to compensate for the absence of evidence that a party had a duty to preserve, its very purpose is to 'nudge' or 'tilt' the jury.").

We reject out of hand University Hospital's contention that the instruction improperly influenced the punitive damages instruction. The instructions specifically limited the conduct for which punitive damages could be awarded to the crucial time period "during the operation from the time the blood was ordered until it was delivered." The missing report had nothing to do with this conduct or time period, and the jury is presumed to follow any instructions given. *Owens v. Commonwealth*, 329 S.W.3d 307, 315 (Ky.2011). In any event, based upon our disposition of the punitive damages issues, this particular point is moot.

### III. THE PUNITIVE DAMAGES INSTRUCTION WAS IM- PROPERLY GIVEN

■■■ An employer is strictly liable for damages resulting from the tortious acts of

his employees committed within the scope of his employment. *Patterson v. Blair,* 172 S.W.3d 361, 364 (Ky.2005). Here, the tortious act supporting the general verdict of liability was either Cantrall's negligent delay in transmitting the blood sample and order for blood to the blood bank, or the blood bank's delay in sending blood to the operating room. University Hospital does not challenge the general verdict. However, University Hospital contends that the trial court erred in giving a punitive damages instruction because KRS 411.184(3) [11] provides that, "In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question."

In his cross motion for discretionary review, Beglin briefly challenged the constitutionality of KRS 411.184(3)'s limitation on the vicarious imposition of punitive damages upon the tortfeasor's employer. However, this Court's order granting the cross-motion expressly denied review of that issue, and, consequently, the hospital did not respond to the point. Also, our review of the record fails to disclose that the Attorney General was notified of Beglin's intent to challenge to the constitutionality of KRS 411.184(3), as required by KRS 418.075(2). Therefore, we make no determination relating to the constitutionality of KRS 411.184(3), notwithstanding the forceful treatment of the issue in Justice Scott's dissenting opinion. *Benet v. Commonwealth,* 253 S.W.3d 528, 532 (Ky. 2008) ("[w]e have made plain that strict compliance with the notification provisions of KRS 418.075 is mandatory."); *Grange Mut. Ins. Co. v. Trude,* 151 S.W.3d 803, 815 (Ky.2004) (Arguments not pursued on appeal are deemed waived).

■■■ The instruction allowing an award of punitive damages against the hospital was proper only if sufficient evidence had been presented to find that University Hospital should have anticipated the wrongful conduct in question (the inordinate delay in providing blood for transfusion), or that it authorized that conduct in question, or that it ratified that conduct.

We assume for purposes of review, without deciding, that Cantrall's conduct, or that of University Hospital's blood bank staff, was sufficiently egregious to constitute gross negligence, the well-established common law standard for awarding punitive damages of gross negligence.[12] We then focus on whether it can be fairly found that University Hospital authorized, ratified, or reasonably could have anticipated that conduct. We conclude that it does not.

■■■ The verb "to authorize" is defined as: "1: to establish by or as if by authority: sanction (a custom authorized by time); 2: to invest especially with legal authority: empower (authorized to act for her husband)" [13] Accordingly, an employer's authorization of an employee to engage in particular conduct connotes pre-approval of the conduct. Therefore, for authorization to be applicable here, we must infer University Hospital's pre-approval of Cantrall and/or the blood bank's conduct in delaying the delivery of the blood to the operating room during Jennifer's surgery.

---

11. KRS 411.184 was held unconstitutional in part in *Williams v. Wilson,* 972 S.W.2d 260 (Ky.1998)

12. *Kinney v. Butcher,* 131 S.W.3d 357, 358–59 (Ky.App.2004) (quoting *Williams v. Wilson,* 972 S.W.2d 260 (Ky.1998)).

13. http://www.merriam-webster.com/ dictionary/authorize (last viewed October 6, 2011).

No evidence here indicates that University Hospital gave, or would ever give, authority to its blood bank or nursing staff to delay the delivery of blood under the circumstances present here. To the contrary, the hospital's policies require a mid-surgery order for blood by an authorized member of the surgical team to be carried out immediately and without delay by all relevant personnel. Accordingly, University Hospital did not authorize the delay in the delivery of blood so as to support the punitive damages instruction.

The verb "to ratify" means: "to approve and sanction formally: confirm (ratify a treaty)"[14] Accordingly, ratification is, in effect, the after the fact approval of conduct, much as authorization is the before the fact approval of the conduct. The record contains no evidence that the Hospital, after the fact, approved of the grossly negligent conduct of its employees which led to Jennifer's death. Beglin argues that the poor quality of the investigation conducted by University Hospital equates with ratification of the tortious conduct. However, the two concepts are quite distinct and we are not persuaded that University Hospital's post-occurrence investigation amounts to approval of the conduct.

Similarly, the alleged attempt by the hospital to actively obstruct the investigation by concealing evidence of the negligence that led to Jennifer's death may be utterly reprehensible, but still it does not constitute "ratification" of that negligence. The alleged cover-up implies, not confirmation or approval of the negligence, but disapproval and a misguided attempt by the hospital to distance itself from the tortious conduct, which is the opposite of ratification.

Finally, we find no evidence upon which one could reasonably conclude that the hospital should have anticipated the incident involved in Jennifer Beglin's surgery. An incident of this type had never before occurred at the hospital. Cantrall and the blood bank employees were well trained and there were policies and procedures in place which required the immediate execution of an order for blood under these circumstances. But for a gross deviation from well established duties and policies, this event would not have occurred. In light of the policies and training in place which should have prevented this event from happening, the hospital clearly could not have *reasonably* anticipated that its employees would fail to timely execute a mid-surgery order for blood.

For the reasons explained above, there is insufficient evidence to demonstrate that University Hospital authorized, ratified, or reasonably could have anticipated the conduct of its employees which resulted in the delay in the delivery of blood to the operating room during the surgery. This appears to be precisely the sort of circumstances under which KRS 411.184(3) is intended to shield an employer from punitive damages. It follows that the trial court erred in giving the instruction, and that the Court of Appeals erred in affirming the judgment for punitive damages. Accordingly, we vacate the punitive damages award and remand for the entry of a new judgment consistent with this opinion.

## IV. OTHER ISSUES

University Hospital finally contends that its due process rights were violated by: (1) the procedures relating to the giving of the missing evidence instruction, and the col-

---

**14.** http://www.merriam-webster.com/ dictionary/ratify (last viewed October 6, 2011).

lateral impact of the instruction on the punitive damages award; and (2) the excessiveness of the punitive damages award.

University Hospital argues that the procedures used by the trial court in deciding to give the missing evidence instruction, and the Court of Appeals's approval of those procedures, permitted the jury to speculate that hospital employees had destroyed the occurrence report, and thereby violated its right to due process. In Section II of this opinion, we discussed extensively the propriety of the missing evidence instruction in the circumstances of this case. As reflected by our previous discussion of the issue, we find no deficiency in the missing evidence instruction given in this case, or in the propriety of giving it. No due process violations occurred as a result of the trial court's exercising its discretion to provide the instruction. Because we reverse the punitive damages award on other grounds, University Hospital's due process argument as it relates to punitive damages is moot, and shall not be further addressed.

University Hospital's argument that the punitive damages award is unconstitutionally excessive is also moot.

## V. BEGLIN'S CROSS–APPEAL

Appellee raised several issues on cross appeal. He acknowledges that the issues he raised would be relevant only in the event we reversed the general verdict of liability, and remanded the case for a new trial. Because we now uphold the judgment with respect to the general verdict, these issues are moot, and need not be addressed.

## VI. CONCLUSION

For the foregoing reasons, the opinion of the Court of Appeals is affirmed in part and reversed in part. This cause is remanded to the Jefferson Circuit Court for entry of Judgment consistent with this opinion.

MINTON, C.J., ABRAMSON, NOBLE, and SCHRODER, JJ., concur. SCOTT, J., concurs in part and dissents in part by separate opinion, in which CUNNINGHAM, J., joins.

SCOTT, J., Concurring in part and dissenting in part.

Although I concur on the other issues, I must respectfully dissent from the majority's dismissal of the punitive damages assessed by the jury in this matter. I do so for several reasons.

First, even under the "complicity standard" incorporated into KRS 411.184(3) [15] by the General Assembly in 1988—as contrasted to the historical standard in negligence actions of whether the act was committed within an employee's "course and scope of employment"—the extensive rules, protocols, and directives of the Hospital, or any hospital for that matter, regarding blood transfusions evince their knowledge, concern, and anticipation that untimely transfusions *do occur and can cause injury.* [16] Thus, I disagree that this conduct was not anticipated—this was not

15. KRS 411.184(3) reads: "In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question."

16. Even the Hospital's incident (occurrence) report form has a section to be checked for blood delivered at the "Wrong time/delayed." It also has a check box for "medical orders, test results, etc. not communicated" as well as "inattention to activity being performed." If one can conceive that such might need "to be reported" in an incident report, it can surely be said such an occurrence *was* anticipated!

an intentional act or "personal adventure," but one of multiple negligent omissions within two highly regulated hospital medical services. That such conduct was *not* prevented provides no absolution.

Secondly, and aside from "anticipation," the evidence in this case supports a conclusion that the Hospital engaged in a systematic cover-up of its staff's inactions: it "lost or destroyed" what should have been a damning incident (occurrence) report that would have normally detailed its staff's failures, "accidentally" shredded all the important blood bank order forms (which should have established critical times) in violation of its policies, the "code" sheet vanished (the operative report never even mentioned a code had occurred!), and it permitted an amendment and substitution in its records for damaging information contained in Jennifer's original discharge summary—*after* suit was filed.[17]

What we are confronted with here is a shocking failure of a hospital to display even the most minimal degree of medical proficiency in transfusing needed blood or blood substitutes: while Jennifer slowly bled out on the operating table—described by Dr. Lerner as "insidious blood loss"— the hospital blood bank was just *steps away*, with the Red Cross blood bank just across the street. Both were stocked with a surplus of readily available life-saving blood. Yet, a ten-minute, life-saving transfusion process inexplicably took seventy minutes, a fact made more astounding by the alleged presence of no less than five highly trained medical professionals in the operating room, not to mention the hospital blood bank personnel on the floor above the operating room where Jennifer lay in dire need of the transfusion.

Black's Law Dictionary defines ratification as the "confirmation of a previous act done ... by another." 1428 (4th ed. 1968). Confirmation, of course, comes in many forms. While I concede the defense of a matter by an employer does not constitute ratification, *Manning v. Twin Falls Clinic & Hosp., Inc.*, 122 Idaho 47, 830 P.2d 1185, 1194 (1992) (Stating that any opposite position "would effectively require a principal to admit its agent's negligence or wrongdoing in every case to avoid a finding of ratification. Such a double-edged position is not sound policy."), evidence sufficient to support a conclusion of affirmative action on the employer's part to conceal, or obfuscate, the conduct of its agents and servants is another matter. Obstruction in any other context would be deemed "ratification." Such evidence exists in this case.

Here the evidence, as accepted by the jury, repeatedly demonstrated the Hospital's proclivity to "lose" inculpatory evidence.[18] At the outset, there is the highly suspicious "disappearance" of Nurse Cantrell's incident (occurrence) report—no one could dispute the fact that an incident report was required in this case—and, the contemporaneous recollection of the nurse charged with ordering the blood should have been the single most probative piece of evidence in this case as to what happened and why. Nurse Cantrell's trial testimony placed this report in the Hospital's possession—not in Jennifer's medical records, but in the bin from which it would eventually go to the Hospital's "risk management" team.[19] Yet, the Hospital some-

---

17. That aside, it billed $16,280.63 for the "too-late" blood administration that killed Jennifer, even though the surgeon had asked that she not be billed.

18. Had there only been one incident of a missing or substituted record, a finder of fact could reasonably conclude inadvertence, yet, a multitude of such alleged errors logically redirects the conclusion.

19. The missing document instruction required the jury to believe that the Hospital "intentionally and in bad faith lost or destroyed the

how "lost" this report in violation of its own policy and that of the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

Next, after the Hospital was sued—some six months after the surgery—Dr. Galandiuk altered and substituted a discharge summary for Dr. Shirley's original and contemporaneous summary in the Hospital's medical records for Jennifer.[20] Dr. Galandiuk's report, which rewrote Jennifer's surgical history, contained markedly different and conflicting observations from those of Dr. Shirley. For example, Dr. Shirley acknowledged that Jennifer "coded" during surgery, which lasted approximately five minutes, while Dr. Galandiuk specifically reported that at no point did Jennifer undergo cardiac arrest.

Moreover, Dr. Shirley's report accurately portrayed the ominous outlook for Jennifer, referencing the lack of oxygen to her brain and the resultant damaged neurological condition. In contrast, Dr. Galandiuk's report acknowledged potential neurological issues, but noted hopefully that the attending neurologist suggested Jennifer may respond to treatment. Dr. Galandiuk's report continued with an optimistic future prognosis, detailing Jennifer's stable condition, her normal temperature, and good oxygenation. Yet, these medical conclusions were preposterous, as *Jennifer died months before Dr. Galandiuk dictated this substituted discharge summary.*[21]

Finally, not only did Dr. Galandiuk's "substituted" report utterly fail to capture the gravity of Jennifer's condition, it neglected to even acknowledge that her condition was caused by unimpeded blood loss and the inability to timely execute a basic blood transfusion.

Lastly, the Hospital shredded the blood order triplicate form. According to its policies, this mandatory form would have detailed the type of blood, the amount requested, and the *time* the blood was ordered. Although Nurse Cantrell filled out a triplicate form, which hospital policy mandated should have been retained *for a year*, the Hospital shredded it—again destroying significant information.[22]

The Hospital asserts, however, that it could not have committed an act of ratification for reasons that it did not know the injury was caused by the "too late" blood transfusion. It asserts that it only acquired the knowledge of the late transfusion during discovery after litigation began. However, Jennifer's original discharge summary dictated by Dr. Shirley indicates that:

> During the surgery the patient began to become hypotensive and the patient was *under-resuscitated* with blood products and was just given crystalloid fluids. The patient's pulse pressure started to narrow and the patient's hemoglobin and hematocrit dropped substantially sec-

---

incident report" before they could infer that the information recorded was adverse to the Hospital. The damages awarded confirm they did.

**20.** Even though the substitution occurred in *its own records*, the Hospital, in its brief asserts that "Dr. Galandiuk, who is not a hospital employee, redictated the summary and substituted it for the original, because the physician who prepared the original summary had made so many errors—at least according to Dr. Galandiuk."

**21.** Even so, the trial court refused admission into evidence of this original summary, an issue raised on this appeal by the Appellee and not addressed by the majority.

**22.** This also violates the American Association of Blood Banks' Standards for Blood Banks and Transfusion services, which was adopted by the Hospital. Although some of this information was transferred to its computer files, critical information was not, as the computer files were not set up to receive this information.

ondary to inter-operative bleeding and *under-resuscitation.* At some point during the surgery, the bleeding was actually found, however, the patient coded at some point during the surgery and the arrested [sic] lasted for approximately less than five minutes. The patient was resuscitated and packed red blood cells were given as quickly as possible and after resuscitation the vital signs remained stable after the operation.

(Emphasis added.) Dr. Galandiuk's discharge summary was not substituted for this one until months after suit was filed.

If evidence supportive of a finding of engaging in a cover-up by "destroying, losing, or changing" vital documents to conceal or obfuscate its employees' conduct is not enough to support ratification if believed, then what additional actions must a litigant prove before it meets this threshold? Do both ratification and anticipation require proof of a similar prior occurrence, as referenced in dicta regarding another issue in *Kentucky Farm Bureau Mut. Ins. Co. v. Troxell,* 959 S.W.2d 82, 85–86 (Ky. 1997) ("We agree that such evidence was relevant in the trial below to show that Farm Bureau was aware that this particular adjuster had previously used methods in handling claims that are unacceptable under Kentucky law and further, that Farm Bureau had knowledge of a pattern of conduct practiced by its agent.")? Did not cumulative evidence of malicious con-

duct previously just go toward *the amount* of punitive damages once it was established that the negligence was gross—or is there now a "one free bite" rule in negligence cases involving employers where the negligence occurred within the direct scope and course of the employee's work?

In fact, the majority's approval and interpretation of KRS 411.184(3) appears to be so restrictive that it essentially strikes "anticipation" and "ratification" as viable grounds for punitive damages against employers except where there is almost an express admission or "one previous bite." This new position will, of course, bring into question many of our prior precedents.[23]

Aside from these prior points, however, my primary objection in this case is that, in this instance, KRS 411.184(3) specifically violates § 241 of the Kentucky Constitution.[24] This is not liability imposed upon an employer based upon an employee's intentional acts as in *Patterson v. Blair,* 172 S.W.3d 361, 366 (Ky.2005) ("As noted . . . an employer's liability is limited only to those employee actions committed in the scope of employment. The central difficulty in applying the rule of respondeat superior focuses on this concept, especially when the tort in question was intentional (as opposed to merely the result of negligence)."), or an employee's "personal adventure" as in *Papa John's Intern., Inc. v. McCoy,* 244 S.W.3d 44, 51 (Ky.2008) (This concept becomes "more complex when the

**23.** Given this new position, the majority, however, does not address Appellee's issue that the trial court erred by refusing Appellee access to the one document that could have shown the Hospital's state of mind—the Hospital's "Root Cause Analysis" as required by the JCAHO. The Hospital admitted the document existed, but was upheld by the trial court on its claim of privilege, notwithstanding that we generally allow expanded discovery in "bad faith" claims

**24.** "[A]n appellate court may affirm a lower court's decision on other grounds as long as the lower court reached the correct result." *Emberton v. GMRI, Inc.,* 299 S.W.3d 565, 576 (Ky.2009). *See e.g. McCloud v. Commonwealth,* 286 S.W.3d 780, 786 n. 19 (Ky.2009) ("[I]t is well-settled that an appellate court may affirm a lower court for any reason supported by the record.") (citing *Kentucky Farm Bureau Mut. Ins. Co. v. Gray,* 814 S.W.2d 928, 930 (Ky.App.1991)).

alleged tort in question is intentional, as is malicious prosecution, as opposed to the result of employee negligence."). This is an action alleging, and tried under, the doctrines of negligence and specifically falling within the job duties of the two hospital departments involved, the surgical nurse and the blood bank.

It was a direct action against two doctors (who were absolved of any liability) and the Hospital, which was sued for its own failure "to exercise the degree of care and skill ordinarily expected of a reasonably competent" hospital. Moreover, the punitive damages award at issue was authorized only under a finding of conduct "in reckless disregard for the lives, safety, or property of others, including Jennifer Beglin," and *before* punitive damages were awardable against the Hospital, the jury had to find, by clear and convincing evidence that the Hospital "(1) should have anticipated the conduct in question, or (2) that it authorized the conduct in question, or (3) that it ratified the conduct in question." In reflecting upon the evidence in this case, it should not go without mention that the jury did award punitive damages and did award them against the Hospital under the instruction mentioned.

Aside from the fact that this Court has, under the "jural rights doctrine" found the right of indemnity to be a "jural right" which existed prior to the adoption of the Constitution and thus a right protected from elimination by the General Assembly, *Kentucky Utilities Co. v. Jackson County Rural Elec. Co-op. Corp.*, 438 S.W.2d 788 (Ky.1968), invalidated a statute which re-

quired actions against home builders to be brought within five years of substantial completion of the home for reasons that such change essentially "destroys, pro tanto, a common-law right of action for negligence that proximately causes personal injury or death, [and] which existed at the times the statutes were enacted" under the doctrine of "jural rights," *Saylor v. Hall*, 497 S.W.2d 218, 224 (Ky.1973), acknowledged in *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky.1993), that "[i]t suffices to say that this Court could not interpret KRS 411.184 to destroy a cause of action for punitive damages otherwise appropriate without fatally impaling upon jural rights guaranteed by the Kentucky Constitution, Sections 14, 54, and 241," and already invalidated KRS 411.184(2) in part, to the extent it discarded "gross negligence" as a traditional standard for punitive damages in violation of the "jural rights doctrine," *Williams v. Wilson*, 972 S.W.2d 260 (Ky. 1998), § 241 of the Kentucky Constitution,[25] standing alone, is quite a different animal.

Section 241 was debated, promulgated, revised, and approved in 1890–1891 and, in its very first sentence, as applicable here, states: "Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the *corporations and persons* so causing the same." (Emphasis added.)

"While many of the threads of the old constitution were retained in the [1891 Constitution], yet it [was] essentially a new

---

25. "The Kentucky Constitution is, in matters of state law, the supreme law of this Commonwealth to which all acts of the legislature, the judiciary and any government agent are subordinate." *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 681 (Ky.1994). Moreover, "[t]he public policy of a state is to be found: first, in the Constitution; second, in the Acts of the

Legislature; and third, in its Judicial Decisions." *Kentucky State Fair Bd. v. Fowler*, 310 Ky. 607, 614, 221 S.W.2d 435, 439 (1949). And, only "[w]here the Constitution is silent, the public policy of the State is to be determined by the Legislature on subjects which it has seen fit to speak." *Id.* Here, the Constitution is not silent.

instrument." *Stone v. Pryor*, 103 Ky. 645, 45 S.W. 1053, 1054 (1898). And, "[i]t was the manifest purpose. of [this Constitution] to preserve and perpetuate the common-law right of a citizen injured by the negligent act of another to sue to recover damages for his injury." *Ludwig v. Johnson*, 243 Ky. 533, 49 S.W.2d 347, 351 (1932). Moreover, we have specifically held that the word "damages" as used in § 241 includes "punitive damages." *Louisville & N.R. Co. v. Kelly's Adm'x*, 100 Ky. 421, 38 S.W. 852, 854 (1897) ("Definitions of this class would clearly include all kinds of damages which might be awarded for an injury, and we think, as used in section 241 of the constitution, the word is used in its broadest sense, and includes all varieties of damages known to the law."). Notably, §§ 241 and 54[26] were parts of this "new" Constitution, whereas § 14[27] was a carry-over from our first Constitution of 1792.[28]

> In its entirety, § 241 provides:
> Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, then, in every such case, damages may be recovered for such death, from the corporations and persons so causing the same. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal represen-tative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

As one can see, it consists of three parts. The first part establishes the right of action and its remedy upon proof of negligence, i.e., "damages may be recovered for such death, from the corporations and persons so causing the same." Ky. Const. § 241. The other two parts establish that: (1) "[u]ntil otherwise provided by law, the action ... shall be prosecuted by the personal representative" and (2) until provision is made, the damages "shall form part of the personal estate of the deceased person." *Id.* Thus, they were concerned in these last two sentences with *who could sue* and *who would get or succeed to the award.*

It is helpful in this regard to review the context within which § 241 was created. Moreover, cases decided near the time of the promulgation and adoption "provide timely insight as to the state of Kentucky law when our 1891 Constitution was adopted." *Williams*, 972 S.W.2d at 263. In addition, the intentions of the drafters may be gleaned from a reading of the

---

**26.** Section 54 reads: "The General Assembly shall have no power to limit the amount to be recovered for injuries resulting in death, or for injuries to person or property."

**27.** Section 14 reads: "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

**28.** As a trilogy, §§ 14, 54, and 241 are often cited as the foundation of the "jural rights doctrine." *Perkins v. Northeastern Log Homes*, 808 S.W.2d 809, 816 (Ky.1991) ("In drafting our constitutional protections in §§ 14, 54 and 241, our founding fathers were protecting the jural rights of the individual citizens of Kentucky against the power of the government to abridge such rights, speaking to their rights as they would be commonly understood by those citizens in any year, not just in 1891."). "These were enacted along with many other provisions to limit the power of the General Assembly, which was then widely perceived as abusing its power with the grant of privileges and immunities to railroads and other powerful corporate interests." *Id.* at 811–12. "They distrusted the General Assembly, so they wrote many details of law into the Constitution.'" *Id.* at 812, *quoting* p. 161, Research Report No. 137, Legislative Research Commission, Jan. 1987.

debates of the 1890 Constitutional Convention, particularly the sections dealing with the discussions, adoption, and revision of § 241.[29] Debates, Ky. Constitutional Convention of 1890, Vol. IV, pp. 4715–20, 5749–52.

*Kelly's Adm'x,* 38 S.W. 852, does just that. It establishes that at the time of the 1890 constitutional convention, §§ 1 and 3 of Chapter 57 of the Kentucky General Statutes controlled actions for wrongful death:

> Section 1 gave a right of action only where the death of a person not in the employment of a railroad company was caused by the negligence of the owners, their agents, etc. Section 3 gave the right of action for the loss of life by willful neglect, a statutory variety of negligence not known to the common law, and provided that the widow, heir, or personal representative of the deceased person shall have the right to sue and recover punitive damages.

*Id.* at 854. This was because under the common law of the time, "[n]o common-law action survived to the personal representative of the deceased." *Id.* at 853 (citing *Givens v. Railway Co.,* 89 Ky. 234, 12 S.W. 257 (1889)). Under precedent of the time, § 1 was limited to compensatory damages, and only for those not in the employ of the railroad, while § 3 allowed punitive damages for "willful neglect" but only for the benefit of a wife and child—the word "heir" having been construed to mean children only. *Jordan's Adm'r v. Cincinnati, N.O. & T.P. Ry. Co.,* 89 Ky. 40, 11 S.W. 1013 (1889).

Thus, where one died as a result of willful neglect leaving no surviving widow or child, no action existed. The Court in *Kelly's Adm'x* noted "that the convention intended to extend the *common-law right of action* to recover both compensatory and exemplary damages for injuries not resulting in death to cases in which death ensued. . . ." *Id.* at 854 (emphasis added). "Historically Kentucky . . . awarded punitive damages against the principal coextensive with the award of punitive damages against the agent, applying the agency principle, respondeat superior, in the same way to liability for punitive damages as it is applied when awarding compensatory damages." *Horton v. Union Light, Heat & Power Co.,* 690 S.W.2d 382, 390 (Ky. 1985).

The Court in *Kelly's Adm'x* also explained the rationale for the rule at the time that a corporation is liable for the acts of its servants and agents performed within the course and scope of their employment, to wit:

> Whether it [the corporation] be public, municipal, or private, it is that invisible, intangible, and artificial person created by law, and made sui juris. It is composed of officers, agents, and servants. They are the corporation. Without them there is no corporation. They are the head, the brains, the mouth, the tongue, and the hands of it. It thinks, speaks, and acts by and through them, and in no other way, and by no other means. The body corporate or politic is composed of these members as one whole, not merely invisible, but indivisible. *Then the act of one is the act of the*

---

29. "If the words contained in a constitutional provision are ambiguous, the debates of the constitutional convention which adopted it may be resorted to in ascertaining the purpose sought to be accomplished or the mischief designed to be remedied by that provision." *Williams v. Wilson,* 972 S.W.2d 260, 274 (Ky.1998) (Cooper, J., dissenting) (citing *Barker v. Stearns Coal & Lumber Co.,* 287 Ky. 340, 152 S.W.2d 953, 956 (1941); *Commonwealth v. Kentucky Jockey Club,* 238 Ky. 739, 38 S.W.2d 987, 993 (1931); *Higgins v. Prater,* 91 Ky. 6, 14 S.W. 910, 912 (1890) (interpreting a provision of the Constitution of 1850)).

*body corporate,-the act of all,-if acting at the time within the scope of the corporate powers.* If a person becomes a wrongdoer by the improper use of his tongue or his hands, the whole body is liable and answerable therefor. Its active members are the component parts of the body, each to perform its appropriate functions. Then, if the act of one is the act of the corporation, the rule or measure of exemplary damages, in a proper case, must apply to a corporation with all the force that it applies to a natural person under like circumstances. Where is a reason for such immunity as exempts a corporation from the severest measure of damages?"

*Id.* at 856 (emphasis added). This is the context of the times within which the 1890 constitutional convention occurred and the 1891 Constitution was adopted.

As initially proposed and adopted by the convention, § 241 (referred to as § 16 during the convention), read as follows:

Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, and damages could have been recovered for such injury, if death had not resulted therefrom, then, in like manner and in every such case, damages may be recovered for such death. Until otherwise provided by law, the action to recover such damages shall in all cases be prosecuted by the personal representative of the deceased person. The General Assembly may provide how and to whom the recovery in such actions shall go and belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

Debates, Vol. IV, p. 4715. Immediately upon its proposal, debate ensued over for whose benefit the award should be recovered, during which the chairman of the committee for general provisions, Mr. William Goebel,[30] explained to the convention:

The provision, directing that the recovery should form a portion of the estate of a deceased person, until otherwise provided by law, was inserted for this reason. This section creates a cause of action. There ought to be somebody entitled specifically in the section to bring a suit as soon as the section goes into effect, otherwise, you have disputes arising as to who should bring the case. Therefore, the Committee drew this section, so as to make the recovery part of the personal estate of the deceased person, until otherwise provided by law.

The Legislature might deem it proper, if there was a surviving widow and children, to divide the recovery, say one-half to the widow and one-half to the children. It might deem it wise to give the whole recovery to the widow, or if there was no widow, then provide that the children should get it all; or if there

---

**30.** Tragically, in February 1900, Goebel was assassinated as he attempted to enter the "Old Capitol" building in Frankfort as the Commonwealth's new Governor. The democratic General Assembly had determined that Goebel was elected as Governor after they had thrown out all the ballots from the republican stronghold of eastern Kentucky because they had been printed on "too thin a paper." *See Taylor v. Beckham,* 108 Ky. 278, 56 S.W. 177 (1900). After Goebel's death, the republican Secretary of State, Caleb Powers was tried four times for his part in the murder.

The first three times, he was sentenced to be "hanged," but his conviction was reversed *each time* by the Kentucky Court of Appeals—then the state's highest court. The fourth time, he was given a life sentence, but was then pardoned by Governor Augustus E. Wilson. *See Powers v. Commonwealth,* 110 Ky. 386, 61 S.W. 735 (1901); *Powers v. Commonwealth,* 114 Ky. 237, 70 S.W. 1050 (1902); *Powers v. Commonwealth,* 114 Ky. 237, 71 S.W. 494 (1903); *Powers v. Commonwealth,* 139 Ky. 815, 83 S.W. 146 (1904).

were dependent relatives, to prefer them over independent ones. Therefore, the Committee thought this should be left open for legislative action; but that there should be a temporary provision defining this until there is a different provision made by law, otherwise disputes will arise as to who is entitled to the recovery.

*Id.* at 4716. Mr. Goebel went on to note:

There have been two attempts to correct existing defects. The paid lobbyists of the railroad corporations came here opposing it. At one session of the Legislature the bill, after passing the Senate, was not permitted to come before the House of Representatives. At the next session of the General Assembly, the bill, after passing the Senate, was carried away from Frankfort. For that reason, as I said on yesterday, conceding that this is legislation, it is proper that the existing evil be corrected here and now. I desire to say, so far as affording any ground of opposition to the Constitution, it will enlist a great many persons in favor of it. Undoubtedly every employe[e] of a railroad will be for this section if embodied in the Constitution. There is nothing that will appeal to them to support the Constitution more than an assurance that if they are killed by negligence, those who are dependent on them can recover damages. Of course it is legislation but when, after repeated attempts by surreptitious means, the action recommended by the Court of Appeals is prevented, I should say it is a proper thing for the Convention to take the matter in hand and permanently correct the defect[.] As to the amendment of the Delegate from Shelby, I do not think it should go into the Constitution. The question of where the recover shall go, it seems to me, is a proper subject to leave to the Legislature, and it should not be fixed by any iron-clad rule of the Constitution.

*Id.* at 4717–18. Thus, one can see that the last two sentences of § 241 leave it to the legislature to determine who shall prosecute the action and how and who shall get its benefit, but if they do not, then it is prosecuted by the personal representative and shall be a part of the decedent's estate—nothing more.

Later, during the final revision of the Constitution, an amended version was offered, to wit:

Whenever the death of a person shall result from an injury inflicted by negligence or wrongful act, *then, in every such case, damages may be recovered for such death from the corporations and persons so causing the same.* Until otherwise provided by law, the action to recover such damages shall, in all cases, be prosecuted by the personal representative of the deceased person. The General Assembly may provide how the recovery shall go and to whom belong; and until such provision is made, the same shall form part of the personal estate of the deceased person.

*Id.* at 5749 (emphasis added).

Offering the amendment, Mr. Goebel explained: "It was intended in making the redraft to strengthen the section, extend its effect and operation, and the substitute undoubtedly does so." *Id.* at 5750. Mr. F.P. Straus then responded:

This section has provoked a great deal of discussion among lawyers. I have had frequent consultations with lawyers about it. If it is possible for the Legislature to so construe this section as to relieve corporations from the negligence of their employe[e]s and agents, and fasten the liability upon the agent, the section ought not to stand.

. . . .

I do not say it is going to be; but if there is any possibility of that, the substitute of the Delegate from Covington [Mr. Goebel] ought to be adopted, because that removes all possibility of such a construction. I think he has improved the section very much and makes the meaning intended by the Convention clearer.

*Id.* at 5751. Mr. C.J. Bronston then asked: "Why are those words used recover Trom the corporations *and* persons.'" *Id.* To which Mr. Straus replied: "That is to prevent the Legislature from saying that you shall recover from one of them, and leave out the corporation." *Id.* Straus further explained that: "This language relieves the section of a construction which may be placed on it by the Legislature, which would enable the Legislature to limit the liability to the person who caused the injury, although he was the agent of the corporation." *Id.* Mr. Bronston later responded that:

If there is any section in this Constitution that, more than any other, furnishes the people rights that they ought to have as against corporations, it is this section.

. . . .

I do not understand why any lawyer even, if he be just at the threshold of his profession, can, for a moment, consider that we mean any thing except simply to restore the right of action which, at common law, ceases on the death of the individual injured. We say it in language unmistakable. Wherever at common law a recovery could be had by a person injured, we provide that if death follows, recovery can still be had, and we say who may bring the action and to whom the recovery should go. Gentlemen of the Convention, I beg of you cross not a t, dot not an I, but let it stand, because to one corporation alone

in the State of Kentucky, this is worth fifty thousand dollars a year.

*Id.* Mr. Straus then responded that: "It was the purpose to have this section so constructed that it would be impossible for the corporations to get a construction by the Legislature so that the corporation can escape." *Id.* at 5752. Mr. Goebel then responded:

I gave the matter of this section some attention before I became a member of the Convention. I have twice introduced bills in the General Assembly upon the subject. I wish merely to add, that after careful examination and study, I believe this substitute is broader in effect, permits recovery where the section as it now stands would not permit a recovery, and better effectuates the object of the Convention than does the section as it is now framed.

*Id.* Mr. Goebel was then asked by Mr. Carroll: "What is the object of having the word 'and' between 'corporation' and 'person' instead of 'or'?" *Id.* Mr. Goebel then responded:

I want to prevent the legislature from saying that the recovery shall be confined to servants of corporations, and unequivocally to impose the liability on both corporation and servant, and then either or both may be sued, and also to authorize suits for death to be maintained, when that could not be done under the section as it now stands in the Constitution.

*Id.* The substitute was then adopted by a vote of the convention, and now stands as § 241 of our Constitution. Will we now uphold it? I believe we will. We should.

Thus, KRS 411.184(3), by attempting to substitute the "complicity standard" for determination of an employer's liability for punitive damages devolving from negligent actions of its agents and servants contra-

venes the specific mandates of § 241 and is, therefore, unconstitutional.

It is for this and the other reasons mentioned that I must dissent.

CUNNINGHAM, J., joins.