RENDERED: SEPTEMBER 18, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-000347-MR

SUZANNE ANDRESS, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE OF
JAMES ANDRESS, AND LEO ANDRESS          APPELLANTS


                 APPEAL FROM KENTON CIRCUIT COURT
v.             HONORABLE KATHLEEN LAPE, JUDGE
                 ACTION NO. 10-CI-03935


ST. ELIZABETH MEDICAL CENTER, INC.;
DONALD SWIKERT, M.D.;
QUALIFIED EMERGENCY SPECIALISTS, INC.;
VINCENT PANGALOS, M.D.;
AND GOOD SAMARITAN HOSPITAL            APPELLEES

AND

NO. 2019-CA-000474-MR


ST. ELIZABETH MEDICAL CENTER, INC. AND
DONALD SWIKERT, M.D.          CROSS-APPELLANTS


          CROSS-APPEAL FROM KENTON CIRCUIT COURT
v.             HONORABLE KATHLEEN LAPE, JUDGE
                 ACTION NO. 10-CI-03935

SUZANNE ANDRESS, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE
OF JAMES ANDRESS, AND LEO ANDRESS        CROSS-APPELLEES


<u>OPINION</u>
<u>AFFIRMING IN PART, REVERSING IN PART,</u>
<u>AND REMANDING</u>

** ** ** ** **

BEFORE:  CALDWELL, DIXON AND L. THOMPSON, JUDGES.

THOMPSON, L., JUDGE:  Suzanne Andress, individually and as administrator of the Estate of James Andress, and Leo Andress, a minor child, appeal from an order of the circuit court which denied their motion for a new trial.  Appellants' motion raised multiple allegations which they argue required the trial judge to recuse herself.  Appellants also appeal a jury instruction issue and an evidentiary issue. On cross-appeal, St. Elizabeth Medical Center, Inc. and Donald Swikert, M.D. appeal three evidentiary issues.  We hold that there is insufficient evidence for us to properly review one of the recusal arguments.  We reverse and remand for additional findings as to one of the recusal issues, but affirm all other aspects of the trial court's judgment.

**FACTS AND PROCEDURAL HISTORY**

On December 16, 2009, James Andress experienced neck pain, dizziness, weakness, trouble speaking, and light-headedness while at work.  Mr.

Andress was transported by ambulance to the Good Samaritan Hospital emergency room in Cincinnati, Ohio. Mr. Andress was examined by Dr. Vincent Pangalos. Dr. Pangalos ran multiple tests on Mr. Andress and concluded that Mr. Andress had simply strained a muscle in his neck and experienced a vasovagal reaction to the pain. Mr. Andress declined pain medication and was discharged. Mr. Andress was also instructed to return to the hospital if his symptoms returned or worsened.

Later that same day, Mr. Andress' pain worsened and he went to St. Elizabeth Family Practice Center in Edgewood, Kentucky. Samuel Bradley, D.O., a second-year resident at the time, examined Mr. Andress. Mr. Andress informed Dr. Bradley about previously being at Good Samaritan. Dr. Bradley obtained and reviewed Mr. Andress' medical records and test results from Good Samaritan.[1] After examining Mr. Andress, Dr. Bradley sought help from Dr. Swikert, his attending physician. Dr. Bradley informed Dr. Swikert about Mr. Andress and informed him Mr. Andress had been to the Good Samaritan emergency room earlier that day. Dr. Swikert examined Mr. Andress, but did not review the Good Samaritan records or order additional tests. Dr. Swikert diagnosed Mr. Andress with a muscle spasm and gave him a prescription for valium and pain medication.

---

[1] It is unclear which records and test results Dr. Bradley reviewed. During discovery in this case, it was discovered that Mr. Andress' medical records from the St. Elizabeth Family Practice Center did not contain the records received from Good Samaritan. Additionally, Dr. Bradley was unable to recall which records he reviewed. All Dr. Bradley could recall was that he requested records from Good Samaritan and received them. This missing evidence will become relevant later in this Opinion.

Four days later, on December 20, 2009, Mr. Andress died from an aortic dissection. At the time of his death, Mr. Andress was 50 years old, married, and had four children, one of which was a minor. On January 8, 2010, Ms. Andress called Dr. Swikert's office and informed him of the death and requested a copy of Mr. Andress' medical records. Appellants filed the instant medical malpractice action in December of 2010. Initially, Judge Martin Sheehan was the presiding judge. Upon his retirement in 2015, Judge Kathleen Lape became the presiding judge.[2] A jury trial occurred in November and December of 2018. Defendants Good Samaritan and Dr. Pangalos were dismissed from the case at trial. A jury verdict eventually found in favor of Appellees. A trial order and judgment reflecting the jury verdict was entered on January 7, 2019.

On January 10, 2019, Appellants filed a motion for a new trial. The motion alleged Judge Lape failed to disclose that her husband, Michael Gerwe, M.D., was an employee of St. Elizabeth Medical Center. It also alleged Judge Lape failed to disclose that she had a personal relationship with Dr. Swikert. Specifically, the motion alleged Dr. Swikert had co-hosted a fundraising event for Judge Lape during her campaign, had donated $200 to her campaign, and that Judge Lape and Dr. Swikert were Facebook friends. Appellants argued that Judge

---

[2] Judge Lape was elected to fill the judicial vacancy left by Judge Sheehan's retirement.

Lape should have disclosed these facts to the parties and should have recused herself from the case.[3]

The motion for a new trial was heard during the court's regularly scheduled motion hour on February 4, 2019. At that time the court made the following oral statement on the record:

> I've called Kentucky home my entire life and have deep, deep connections with this community. This community is relatively small and the legal community is even smaller. My father was a circuit judge for 18 years, everybody knows that, his picture is on the wall. I've practiced here for years, becoming a circuit judge. I was an attorney in this area for over 20 years before taking the bench. I have many friends and acquaintances in this community. Many are physicians, many are lawyers, many are police officers, many are just regular people. My father was also a colleague of Plaintiff's counsel, Mr. Sanders. My family has known the Sanders family for many generations. Based on the knowledge that Mr. Sanders has of my family and myself, it would not occur to me that I would have to disclose anything about myself. Furthermore, as to any contributions to any of my campaigns, I have thousands of contributors, and as Plaintiff's counsel has shown, that information is easily accessible, as is information about me and my family. I am very transparent and I did that on purpose. That said, this is not the first time I have dealt with this issue and I'm sure it's not the last. I'm sure it's not the last time I'm going to deal with it this week. Everybody knows my husband is a physician. He's an OB/GYN, he's an obstetrician/gynecologist. He is not employed by St. Elizabeth Medical Center or any of its derivative

---

[3] Appellants claim that they became concerned about Judge Lape's impartiality during trial and began researching her background; however, the issue of recusal was not raised until after the trial concluded.

-5-

corporations. He provides services to women at the only full-service hospital in Northern Kentucky. St. Elizabeth Medical Center is arguably the largest employer in Kenton County and the only full-service hospital in Northern Kentucky. Many, many people have connections to that institution. In fact, I believe there were jurors who sat on this panel who had connections to St. Elizabeth. So, there was no conflict, there was no bias. All my decisions were made based on sound legal principle, therefore, Plaintiff's motion is overruled.

An order was entered denying the motion for a new trial on February 8, 2019. Due to some procedural issues, a second order denying the motion was entered on February 20, 2019. This appeal followed.

## ANALYSIS

The first issue we will address in this appeal is Appellants' argument that the trial court erred in denying their motion for a new trial due to Judge Lape's failure to disclose her husband Dr. Gerwe's connection to St. Elizabeth Medical Center. "The granting of a new trial is within the discretion of the trial court. When a trial court denies a motion for a new trial, our standard of review is whether there has been an abuse of that discretion." *Kaminski v. Bremner, Inc.*, 281 S.W.3d 298, 304 (Ky. App. 2009). We also review a judge's decision regarding recusal for abuse of discretion. *Minks v. Commonwealth*, 427 S.W.3d 802, 806 (Ky. 2014). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal

principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted).

Appellants rely on Kentucky Revised Statutes (KRS) 26A.015(2)(e) and Judicial Canons found in Rules of the Kentucky Supreme Court (SCR) 4.300 for their argument that Judge Lape should have recused from this case. While KRS 26A.015(2)(e) is certainly relevant to this case, we feel it necessary to quote all of KRS 26A.015(2) because other subsections may have bearing on this case. KRS 26A.015(2) states:

> Any justice or judge of the Court of Justice or master commissioner shall disqualify himself in any proceeding:
>
> (a) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings, or has expressed an opinion concerning the merits of the proceeding;
>
> (b) Where in private practice or government service he served as a lawyer or rendered a legal opinion in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter in controversy, or the judge, master commissioner or such lawyer has been a material witness concerning the matter in controversy;
>
> (c) Where he knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a pecuniary or proprietary interest in the subject matter in controversy or in a party to the proceeding;

(d) Where he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

> 1. Is a party to the proceeding, or an officer, director, or trustee of a party;

> 2. Is acting as a lawyer in the proceeding and the disqualification is not waived by stipulation of counsel in the proceeding filed therein;

> 3. Is known by the judge or master commissioner to have an interest that could be substantially affected by the outcome of the proceeding;

> 4. Is to the knowledge of the judge or master commissioner likely to be a material witness in the proceeding.

(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned.

Similar grounds for recusal can also be found in SCR 4.300, Canon 2, Rule 2.11, which states:

(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality*[4] might reasonably be questioned, including but not limited to the following circumstances:

(1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge* of facts that are in dispute in the proceeding.

---

[4] An asterisk after a word indicates that word is defined in SCR 4.300, Terminology section.

(2) The judge knows* that the judge, the judge's spouse or domestic partner,* or a person within the third degree of relationship* to either of them, or the spouse or domestic partner of such a person is:

> (a) a party to the proceeding, or an officer, director, general partner, managing member, or trustee of a party;

> (b) acting as a lawyer in the proceeding;

> (c) a person who has more than a de minimis* interest that could be substantially affected by the proceeding; or

> (d) likely to be a material witness in the proceeding.

(3) The judge knows that he or she, individually or as a fiduciary,* or the judge's spouse, domestic partner, parent, or child, or any other member of the judge's family residing in the judge's household,* has an economic interest* in the subject matter in controversy or in a party to the proceeding.

(4) The judge, while a judge or a judicial candidate,* has made a public statement, other than in a court proceeding, judicial decision, or opinion, that commits or appears to commit the judge to reach a particular result or rule in a particular way in the proceeding or controversy.

(5) The judge:

> (a) served as a lawyer in the matter in controversy, or was associated with a lawyer who participated substantially as a lawyer in the matter during such association;

> (b) served in governmental employment, and in such capacity participated personally and

substantially as a lawyer or public official concerning the proceeding, or has publicly expressed in such capacity an opinion concerning the merits of the particular matter in controversy;

(c) was a material witness concerning the matter; or

(d) previously presided as a judge over the matter in another court.

Under both KRS 26A.015(2) and SCR 4.300, Canon 2,

recusal is proper if a judge determines that his impartiality might reasonably be questioned; in fact, it is mandatory. Furthermore, there is always the higher consideration that every litigant is entitled to nothing less than the cold neutrality of an impartial judge and should be able to feel that his cause has been tried by a judge who is wholly free, disinterested, impartial and independent.

*Petzold v. Kessler Homes, Inc.*, 303 S.W.3d 467, 471 (Ky. 2010) (citations and internal quotation marks omitted). "The burden of proof required for recusal of a trial judge is an onerous one. There must be a showing of facts of a character calculated seriously to impair the judge's impartiality and sway his judgment." *Bissell v. Baumgardner*, 236 S.W.3d 24, 28-29 (Ky. App. 2007) (citations and internal quotation marks omitted). The recusal inquiry "is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Dean v. Bondurant*, 193 S.W.3d 744, 746 (Ky. 2006) (citation and internal quotation marks omitted).

We will now apply the statute, judicial canon, and case law discussed above to Appellants' argument that Judge Lape should have recused due to her husband's relationship to St. Elizabeth Medical Center. Appellants argue that Dr. Gerwe is employed by St. Elizabeth and that he holds himself out to be the "Chairman" of St. Elizabeth's OB/GYN group. Judge Lape found no need to recuse based on this because her husband was not an employee of St. Elizabeth, but was an independent contractor[5] who performed services for women at St. Elizabeth's.

We agree with Judge Lape on this issue. Judge Lape stated on the record that her husband was not an employee of St. Elizabeth. This is supported by exhibits filed by Appellees which indicate that Dr. Gerwe is employed by Seven Hills OB-GYN Associates, P.S.C., but has privileges at St. Elizabeth Medical Center. In addition, the services rendered to Mr. Andress had nothing to do with Dr. Gerwe or OB/GYN services.

After reviewing KRS 26A.015(2) and SCR 4.300, Canon 2, specifically the sections dealing with a judge's spouse and the catchall provision in KRS 26A.015(2)(e), we hold that an objective, reasonable observer who knew all the facts surrounding Judge Lape and Dr. Gerwe's connection to St. Elizabeth

---

[5] Judge Lape does not use the term independent contractor, but it is clear to this Court that is what she was describing.

-11-

would not conclude that Judge Lape needed to recuse from the case. Dr. Gerwe only had a *de minimis* connection to St. Elizabeth, had no pecuniary interest in the outcome of the case, and had no interest that could be substantially affected by the proceedings. Judge Lape's decision not to recuse was reasonable under the circumstances; therefore, there was no abuse of discretion.

We must also point out that "[e]ven where an actual disqualifying condition is discovered after entry of judgment, it does not follow automatically that the judgment must be vacated." *Petzold*, 303 S.W.3d at 473. *Petzold* considered and relied on the analysis of *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), to determine when a judgment must be vacated for violation of the recusal statute or judicial canon. In *Liljeberg*, the United States Supreme Court stated the following:

> We conclude that in determining whether a judgment should be vacated for a violation of [the federal recusal statute], it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Id.*, 486 U.S. at 864, 108 S.Ct. at 2205.[6]

---

[6] *Petzold* and *Liljeberg* discuss this three-part test for determining if a recusal issue necessitates the vacating of a judgment, also known as retroactive recusal, in relation to Kentucky Rules of Civil Procedure (CR) 60.02 and Federal Rules of Civil Procedure 60. These rules are almost identical to each other. We also believe it is reasonable to apply it to a CR 59.01 and CR 59.05 motion for a new trial as those rules are similar to CR 60.02.

Turning to the *Liljeberg* three-part test, even if Judge Lape should have recused herself from the proceedings, we do not believe vacating the judgment is required in this case. As to the risk of the injustice to these parties, while Appellants state that they had some reservations about Judge Lape's impartiality during trial, they do not point out any of her actions that caused such suspicion. In addition, this was not a bench trial where Judge Lape was the sole arbiter who decided the fate of the cause of action. A jury heard the evidence and found that Appellees were not responsible for the death of Mr. Andress. As for looking at other cases, Judge Lape indicated in her recusal statement that she has to regularly deal with her ties to St. Elizabeth during her judicial duties. It is not indicated in the record if Judge Lape has disclosed her ties to St. Elizabeth in other cases; however, we believe that this case has put the issue on her radar and she will be more cognizant of it going forward. Finally, as to the risk of undermining the public's confidence, as stated above, an objective, reasonable observer who has all the facts would not conclude that Dr. Gerwe's connection to St. Elizabeth would mean Judge Lape is biased towards that institution.

We now move to Appellants' second argument regarding recusal. Appellants argue that Judge Lape failed to disclose her relationship with Dr. Swikert. Specifically, Dr. Swikert and his wife co-hosted a fundraiser during Judge Lape's judicial campaign, Dr. Swikert contributed $200 to Judge Lape's

campaign, and Dr. Swikert and Judge Lape are Facebook friends. Appellants claim that these facts, collectively, make an objective, reasonable observer question Judge Lape's impartiality.

Taken individually, the $200 campaign contribution would not require Judge Lape to recuse herself. Recusal is not required "merely based on a campaign contribution within the state's campaign donation limits. To the contrary, the cases that require recusal all involve the existence of a substantial donation coupled with other activities that reasonably raise questions of impartiality." *Dean*, 193 S.W.3d at 751 (citations omitted); *see also Bissell*, 236 S.W.3d at 29.

We also believe that Dr. Swikert's participation in the fundraiser, taken alone, would not require recusal. Appellants' argument stems from an advertisement for the fundraiser which lists over 70 people who "invite" the reader to the fundraiser and states that the fundraiser was being hosted by Nancy and Dr. Thomas Bunnell. It is not clear that Dr. Swikert was a co-host at all; however, even if we were to assume he was, there were over 70 other co-hosts. This was clearly not an intimate affair. Dr. Swikert also did not donate any more money to Judge Lape's campaign during this fundraising event.[7]

---

[7] The fundraiser was held on March 3, 2014, and Dr. Swikert's only campaign donation occurred on January 29, 2014.

-14-

Unfortunately, as it pertains to the Facebook friends aspect of this argument, there is no evidence in the record regarding this claim. Judge Lape did not mention it in her oral recusal statement or in her orders denying the motion for a new trial. Being a Facebook friend does not necessarily require recusal. Kentucky's Judicial Ethics Committee has stated:

> While the nomenclature of a social networking site may designate certain participants as "friends," the view of the Committee is that such a listing, by itself, does not reasonably convey to others an impression that such persons are in a special position to influence the judge. Certainly, judges have many extra-judicial relationships, connections and interactions with any number of persons, lawyers or otherwise, who may have business before the judge and the court over which he or she presides. These relationships may range from mere familiarity, to acquaintance, to close, intimate friendship, to marriage. Not everyone of these relationships necessitates a judge's recusal from a case.

Judicial Ethics Opinion JE-119, 2010 WL 8973626, at *1 (Jan. 20, 2010). In this case, the record is silent as to the extent of Judge Lape's Facebook friendship with Dr. Swikert. Are they simply Facebook friends who are only vaguely familiar with each other or are they neighbors who routinely socialize with one another? While we doubt it is the latter, we do not have any information regarding the scope of the friendship.

Since we must look at the connections between Dr. Swikert and Judge Lape individually, as well as collectively, we cannot say for certain if Judge Lape

-15-

should have disclosed this information or recused herself; therefore, we must reverse and remand for more information. On remand, Judge Lape must indicate what level of friendship she has with Dr. Swikert and analyze it collectively with the campaign issues. It may also be prudent to address the *Liljeberg* three-part test discussed *supra*.

Moving on from the recusal aspects of this appeal, we will now address the jury instruction issue raised by Appellants. Appellants claim that the trial court should have included a spoliation of evidence instruction[8] in the jury instructions. When evidence is missing or has been destroyed, a spoliation instruction can be warranted. *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783, 787-88 (Ky. 2011), *as modified on denial of reh'g* (Mar. 22, 2012). Such an instruction would be similar to this: If you believe missing exhibit X contained material information and was intentionally and in bad faith lost or destroyed, then you may, but are not required to, infer that the information in missing exhibit X would be adverse to the defendant and favorable to the plaintiff. Appellants claim that because the Good Samaritan records requested and obtained by Dr. Bradley were missing from Mr. Andress' St. Elizabeth records, and there is no good explanation as to what happened to them, the spoliation instruction was warranted.

---

[8] Also known as a destruction of evidence or missing evidence instruction.

A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard.

*Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015) (footnote omitted).

[W]hen the evidence is missing "utterly without explanation," and where . . . the party who has lost it had absolute care, custody, and control over the evidence, we believe that the better practice is to treat missing evidence like any other evidentiary issue, and refrain from placing an enhanced burden upon the opposing party to obtain the instruction. . . . A trial court may use normal inferences and suppositions, and may rely upon circumstantial evidence in deciding whether to admit missing evidence testimony or give a corresponding instruction.

*Beglin*, 375 S.W.3d at 790 (citations omitted). "[N]onproduction alone is sufficient by itself to support an adverse inference even if no other evidence for the inference exists. . . . The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them." *Id.* at 789 (citations and internal quotation marks omitted).

The request for this instruction was made pretrial and after trial as the parties were discussing jury instructions. During the pretrial conference, the trial judge indicated that there had been no evidence of bad faith at that time for a

spoliation instruction. After trial, the judge indicated the instruction was not warranted because the evidence presented suggested that the records were lost at the time of Mr. Andress' visit to the St. Elizabeth Family Practice Center and not after his death when the Appellees might have anticipated litigation.

We do not believe the trial court abused its discretion in declining to give a spoliation instruction; however, we come to this conclusion based on other grounds.[9] Dr. Bradley testified that he had no idea what happened to the records. He speculated that he could have given them to Mr. Andress, could have accidentally left the medical facility with them at the end of the day, or could have left them in a pile of paper to be shredded. Dr. Swikert also testified that he did not know what happened to the records; however, he also testified that he did not believe they would have been kept in the first place. He testified that his practice was to not keep records from other medical facilities in a patient's file. Based on the testimony of these doctors, the trial court concluded that the records at issue went missing on the day Mr. Andress was seen at the medical center and not after his death when a lawsuit could have been anticipated.

We believe this finding by the court was erroneous. There was no clear evidence what happened to the medical records at issue or when they went

_____

[9] The Court of Appeals may affirm a judgment on other grounds than those relied on by the trial court. *See Commonwealth Natural Resources and Environment Protection Cabinet v. Neace*, 14 S.W.3d 15, 20 (Ky. 2000); *O'Neal v. O'Neal*, 122 S.W.3d 588, 589 n.2 (Ky. App. 2002).

-18-

missing. Dr. Bradley and Dr. Swikert only speculated as to what happened to the records. A spoliation instruction

> contemplates that the jury will engage in fact-finding ("*if you find from the evidence…*"), thereby implying that, like any other issue, if there is a factual dispute in relation to the issue, the jury will resolve the disagreement. This obviously implies that, under our law, the trial court does not make any final and conclusive factual determination upon the elements of a missing evidence instruction.

*Beglin*, 375 S.W.3d at 788 (emphasis in original). Here, the trial court made findings of fact by assuming the records likely went missing when Mr. Andress was examined by Dr. Bradley and Dr. Swikert and not after Mr. Andress' death. Appellants argued that the records could have been intentionally destroyed after Appellees were informed that Mr. Andress died. There was no evidence presented one way or the other, as to what actually happened to the records or when they went missing, only speculation; therefore, it should have been up to the jury to decide this factual dispute.

We still believe the trial court correctly declined to give a spoliation instruction, albeit for different reasons, because the missing records were not in the absolute or exclusive care, custody, and control of St. Elizabeth and Dr. Swikert. The records were also available from Good Samaritan. In fact, Appellants used the Good Samaritan records to question the witnesses. Appellants were able to question witnesses about whether Dr. Bradley and Dr. Swikert acted appropriately

assuming they had certain Good Samaritan records. Seeing as Appellants obtained the missing records from another source and were able to question witnesses about these records, there was no need for a spoliation instruction.[10]

Appellants' final argument on appeal is that the trial court erred in classifying two documents as privileged and preventing Appellants from introducing either document at trial. One of the documents was a letter written by Dr. Swikert to St. Elizabeth's Risk Management Department informing it of Mr. Andress' death. The second document was a missed call phone slip indicating that someone from Risk Management had called Dr. Swikert's office and requested a copy of Mr. Andress' medical records. The phone slip also contains a stamp indicating that a copy of the records was sent to Risk Management.[11]

These documents were in Mr. Andress' medical records file and were given to Appellants during discovery. Appellees argued during pretrial that these documents were inadvertently included in the medical records, that they were protected by attorney-client privilege, and that Appellants should be prohibited

---

[10] This Court was unable to locate Kentucky case law concerning whether it was appropriate to give a spoliation instruction when missing evidence was obtained from another source. We did find case law from other jurisdictions which holds as we do in this Opinion. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 443-44 (S.D.N.Y. 2010); *Burge v. St. Tammany Par.,* 336 F.3d 363, 373-74 (5th Cir. 2003); and *Rosenblit v. Zimmerman*, 766 A.2d 749, 758-59 (N.J. 2001).

[11] These documents are in the record under seal and we have examined them. As they are under seal and concern issues of attorney-client privilege, we will try to limit our discussion regarding the specific contents of the documents.

-20-

from using or discussing them at trial. Appellants argued, and continue to argue on appeal, that the documents were not privileged because they were not written by or to an attorney, were not intended to be confidential, and did not contain information for the purposes of seeking legal advice. The trial court ordered that the contents of the letter and call slip were privileged, but Appellants' counsel was allowed to ask Dr. Swikert if he sent a letter to Risk Management.

"[A]ttorney-client privilege applies only to 'confidential communication[s] made for the purpose of facilitating the rendition of professional legal services to the client,' [Kentucky Rules of Evidence (KRE)] 503(b)[,] and not to other services an attorney might provide, such as business advice." *Collins v. Braden*, 384 S.W.3d 154, 160 (Ky. 2012).

> And "[d]espite the historic and modern sanctity of the attorney-client privilege, not all communications between an attorney and a client are privileged, and [thus] the burden is on the party claiming the privilege to prove that it exists as to the communications so claimed." . . . .
>
> And whether the privilege applies is a mixed question of law and fact that is "often reviewed de novo." . . . .
>
> Unlike in the federal courts, the attorney-client privilege in Kentucky is governed by the Rules of Evidence, specifically KRE 503. The basic rule of the privilege allows a client "to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client." KRS 503(b). The communication must be "[b]etween

-21-

the client or a representative of the client and the client's lawyer or a representative of the lawyer," "[b]etween the lawyer and a representative of the lawyer," "[b]etween representatives of the client or between the client and a representative of the client," or "[a]mong lawyers and their representatives representing the same client." KRE 503(b)(1)-(5).

Under KRE 503, employees of a client can be treated as "representatives" of the client. So, generally speaking, and assuming they meet a few additional requirements, confidential statements made by a client's employees to the client's legal counsel are protected as much as statements by the client itself. Likewise, statements by the lawyer to the client or to the client's employees, again assuming they meet the additional requirements, are also protected.

Two of the additional requirements to establish the privilege apply in every case. First, the statements must actually be confidential, meaning they are "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." KRE 503(a)(5). Second, the statements must be made for the purpose of obtaining or furthering the rendition of legal services to the client. KRE 503(b).

When statements by employees of a client are involved, still more requirements must be met. Specifically, the privilege only applies if the employee is a "representative of the client" for purposes of the privilege. A client's employee can be a representative of the client in making or receiving a confidential communication only if he or she does so "[i]n the course and scope of his or her employment," the statement is "[c]oncerning the subject matter of his or her employment," and the statement is made "[t]o effectuate

-22-

> legal representation for the client." KRE 503(a)(2)(B)(i)-(iii).  The first two requirements are substantial limitations on the privilege.

*Id.* at 161-62 (footnote and citations omitted).  "Whether a particular communication is privileged depends (absent waiver) not on what use was ultimately made of the communication, but on the facts and circumstances under which the communication was made." *Lexington Public Library v. Clark*, 90 S.W.3d 53, 59 (Ky. 2002).

We believe that Dr. Swikert's letter was properly excluded due to attorney-client privilege.  At the time the letter was sent, the Risk Management Department at St. Elizabeth was headed by a licensed attorney who was St. Elizabeth's internal legal counsel.  The department's function is to review issues and provide legal advice concerning potential claims.  The letter was dated soon after Ms. Andress contacted Dr. Swikert's office informing him of her husband's death and requesting a copy of the medical records.  While the letter does not specifically request legal advice or mention the possibility of a lawsuit, it is clear that it was written to inform the Risk Management Department of Mr. Andress' death and put them on notice a lawsuit was likely.  Furthermore, an affidavit in the record from Dr. Swikert states that the letter was sent in order to inform the department of a possible medical negligence claim and to seek advice.  The affidavit also states that Dr. Swikert intended the letter to be confidential and it was

not intended to be put into Mr. Andress' medical file. Even without Dr. Swikert's affidavit, we believe the letter was clearly intended as a confidential communication to the department regarding a potential lawsuit.

As for the phone slip, it contained information that someone from the Risk Management Department had called Dr. Swikert's office and requested a copy of Mr. Andress' medical records. This call occurred after Dr. Swikert sent the letter to the department informing it of Mr. Andress' death. It also contained a stamp showing that the records were faxed to the Risk Management Department. Due to the timing of the call, *i.e.*, that it was made after Mr. Andress' death and after Dr. Swikert informed the department of the death, we agree with the trial court that this communication was privileged. The call from Risk Management to Dr. Swikert was essentially following up on Dr. Swikert's letter, which we have held to be confidential and privileged. If the letter was privileged, it stands to reason that the call slip indicating a follow-up call should also be privileged. We find no error.

We will now move on to the cross-appeal. Appellees first argue that the trial court erred in allowing Appellants to elicit testimony from Dr. Swikert which revealed that he sent a letter to Risk Management after Mr. Andress' death. Appellees argue that this questioning should not have been allowed as it was irrelevant and all events surrounding the letter should have been privileged. The

trial court allowed this question because it could go to St. Elizabeth's protocol and would not reveal privileged information.

The proper standard for review of evidentiary rulings is abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). We believe the relevance of the fact that Dr. Swikert sent a letter to Risk Management is debatable; however, as we cannot definitively say it was irrelevant, we will not conclude that allowing the question was an abuse of discretion. We also agree with the trial court that since no information regarding the contents of the letter were revealed to the jury, then there is no violation of the attorney-client privilege.

Appellees' next claim is that the trial court erred by permitting Appellants to put on testimony regarding Ms. Andress' financial hardships after her husband's death. Appellees claim this testimony was irrelevant, prejudicial, and sought to paint the "rich" hospital and doctor in a bad light. The trial court allowed it by finding that it went to show Mr. Andress' earning capacity and Ms. Andress' lost income. As this is an evidentiary issue, we review it for abuse of discretion. We agree with the trial court's reasoning. The testimony regarding Ms. Andress' poverty showed that Mr. Andress' earnings helped support the family and that, without those earnings, Ms. Andress was having financial hardships. There was no abuse of discretion.

Appellees' final argument is that the trial court erred in permitting Appellants to introduce into evidence, and elicit testimony concerning, Dr. Bradley's performance review. We will review this evidentiary issue for abuse of discretion.

During Dr. Swikert's examination by Appellants' counsel, Appellants' trial counsel handed Dr. Swikert a performance review, dated December of 2009. The performance review was concerning Dr. Bradley's skills as a doctor.[12] The questioning revolved around the fact that Dr. Swikert gave Dr. Bradley low scores on the evaluation, but still relied on him to read and interpret medical records and provide necessary information regarding patient care. In other words, Dr. Swikert relied on Dr. Bradley to inform him of the necessary information needed to treat patients like Mr. Andress.

Appellees argue that this information was irrelevant to the standard of care for diagnosing an aortic dissection and was improper in that it was being used to show that if Dr. Bradley had low scores, he was likely negligent on the day he examined Mr. Andress. Appellees cite to KRE 403[13] and KRE 404.[14] The trial

---

[12] As previously mentioned, Dr. Bradley was a second-year resident when he examined Mr. Andress. These performance reviews are part of the residency program.

[13] KRE 403 states that relevant evidence can be excluded if it is overly prejudicial.

[14] KRE 404 states that evidence of a person's character is inadmissible to show that the person may have acted in conformity with that character on a particular occasion.

court allowed this line of questioning because Appellants' counsel was using it to show Dr. Swikert may have been negligent in relying on Dr. Bradley. To state it another way, the evidence was not being used to impugn Dr. Bradley's skills, but to show that Dr. Swikert should not have relied so heavily on Dr. Bradley.

We agree with the trial court's judgment on this issue. Dr. Swikert's reliance on Dr. Bradley's interpretation of medical information is relevant as to whether Dr. Swikert may have been negligent in relying so heavily on Dr. Bradley in light of Dr. Bradley receiving poor performance review scores. The performance review was not used to question Dr. Bradley or show that he might have been negligent in his examination of Mr. Andress. The evidence was used to question Dr. Swikert's actions. There was no abuse of discretion in allowing this line of questioning.

## CONCLUSION

Based on the foregoing, we affirm in part, reverse in part, and remand. On remand Judge Lape should be more specific as to her relationship with Dr. Swikert in light of her being Facebook friends with him. Judge Lape should then determine if the Facebook friendship and Dr. Swikert's connections to her judicial campaign were so extensive as to require her recusal. Judge Lape should also consider the *Liljeberg* three-part test if necessary.

DIXON, JUDGE, CONCURS.

CALDWELL, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

CALDWELL, JUDGE, CONCURRING IN PART AND DISSENTING IN PART: I agree with the majority except for the failure of the trial court to give the jury a spoliation, or missing evidence, instruction. While I agree with the analysis of the majority in determining that the when, where, and how the medical records received from Good Samaritan went missing from Mr. Andress' file should be resolved by the jury, I do not agree with the ultimate opinion finding that having the original of the records from Good Samaritan made the spoliation instruction unnecessary.

The missing evidence in this action are medical records that St. Elizabeth physicians utilized in determining their treatment of Mr. Andress. That there would not be a well-established and routinely utilized method for preservation of a patient's medical records utilized by the facility, whether or not the records were initially produced by diagnostic work performed by the facility, is specious at best.

I agree that there may be many instances where having original records would obviate the need for copies and perhaps would even be preferred. However, in medical malpractice actions such as this, it is imperative to plaintiffs'

-28-

cases to know exactly what records a treating facility had at the time of treatment, not what they may or may not have had.

As noted in the Appellants' brief, under Kentucky Rules of Evidence (KRE) 201, the trial court and this Court may take judicial notice of former 902 Kentucky Administrative Regulations (KAR) 20:058 (the regulation in place at the applicable time of this action) which sets out what records a facility, such as St. Elizabeth, must maintain and how long said records should be maintained.

Appellees argue that because Appellants obtained the complete records from Good Samaritan, there is no harm in those same records having not been maintained as part of Mr. Andress' record from St. Elizabeth. This argument could hold water if Appellees had agreed to stipulate that they had received all the records from Good Samaritan. St. Elizabeth was unwilling to so stipulate. St. Elizabeth wanted to be able to claim they relied on test results and records provided from Good Samaritan in their treatment of Mr. Andress but not have to acknowledge receiving records that may be harmful to their case. Essentially, Appellees seek to have their cake and eat it, too. For the trial court to so concede is an abuse of discretion and the spoliation instruction should have been submitted to the jury.

BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

Gregory M. Utter
Michael T. Cappel
Sarah Vonderbrink Geiger
Cincinnati, Ohio

Robert E. Sanders
Covington, Kentucky

BRIEFS FOR APPELLEES/CROSS-
APPELLANTS ST. ELIZABETH
MEDICAL CENTER, INC. AND
DONALD SWIKERT, M.D.:

Ellen M. Houston
Ryan M. McLane
Crestview Hills, Kentucky